UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

VERANIA DOMINGUEZ,                          :
         Plaintiff,                        :
                             :
       v.                                :       No. 5:24-cv-00852
                             :
EAGLE RIVER HOMES, LLC and                  :
MANPOWERGROUP US, INC.,                     :
*d/b/a MANPOWER*,                           :
         Defendants.                       :
_____

## **O P I N I O N**
**Manpower Motion for Summary Judgment, ECF No. 38 – Granted**
**Eagle River Motion for Summary Judgment, ECF No. 46 – Granted in part, Denied in part**

**Joseph F. Leeson, Jr.**                                               **April 15, 2025**
**United States District Judge**

## I.    INTRODUCTION

       Plaintiff Verania Dominguez, who worked at Defendant Eagle River Homes, LCC during

her employment with Defendant Manpower, was terminated by Eagle River for missing work

after a car accident in which she sustained a concussion.  Dominguez alleges Eagle River and

Manpower, as her employers, violated her rights under the the Americans with Disabilities Act

("ADA") through discrimination, failure to accommodate, and retaliation.  Eagle River and

Manpower have each moved for summary judgment on all claims.  For the reasons set forth

below, because the evidence shows that Dominguez was not disabled, summary judgment is

granted on the discrimination and failure-to-accommodate claims.  Summary judgment is denied

on the ADA retaliation claim as to Eagle River, but granted as to Manpower for lack of evidence

showing adverse action.  The Motions for Summary Judgment are therefore granted in part and

denied in part.

## II.    FACTUAL BACKGROUND[1]

### A.    Dominguez's employment and Defendants' employment policies

Manpower is a staffing agency that contracts with other companies, including Eagle

River.  *See* Manpower Stmt Facts ¶ 1, ECF No. 38-2; Resp. Manpower Stmt Facts ¶ 1, ECF No.

43-3.  Manpower provides Eagle River with individuals to work at Eagle River's facility.  *See*

Cox[2] Dep. 23:14-22, ECF No. 38-6.  Eagle River refers individuals who will be working in an

Eagle River facility to Manpower to process into Manpower's payroll system.  *See id.* at 44:2-5.

Manpower invoiced Eagle River weekly for work performed by assigned employees, which was

calculated based on hours worked reported to Manpower.  *See* Dominguez Dep. at Ex. H, ECF

No. 38-3.  Any time Eagle River hires a new person, it refers the new hire to Manpower.  *See*

Bankes[3] Dep. 23:20 – 25:9, ECF No. 38-4.  Manpower is involved while the new employee is in

his/her probationary period, which typically lasts three (3) to four (4) months.  *See id.* at 24:5-10.

During this time, if Eagle River chooses to terminate the individual, that employee is told of the

termination by Manpower, not Eagle River.  *See* Cox Dep. 37:10-17.  After completion of the

probationary period, the person may be considered for full-time employment with Eagle River.

*See* Fausnacht[4] Dep. 46:22 – 47:19, ECF No. 42-12.

Dominguez, who had no prior affiliation with Manpower, applied for a position directly

with Eagle River because her sister worked for Eagle River.  *See* Dominguez Dep. 94:22 – 95:1,

121:15-17, 173:4-21.  Eagle River advised Dominguez that she had to apply for employment at

---

[1]     To the extent any of the facts discussed herein are disputed, they are so noted and
distinguished accordingly.
[2]     Kim Cox is the market manager for Manpower.  *See* Cox Dep. 13:16 – 14:7.
[3]     Karli Bankes was Eagle River's human resources administrator.  *See* Bankes Dep. 15:11-
22.
[4]     Kathy Fausnacht was the controller, human resources director with Eagle River.  *See*
Fausnacht Dep. 17:20 – 19:20.

Manpower.  *See id.* at 94:22 – 95:5.  She signed an Associate Agreement with Manpower on November 2, 2022.  *See* Assoc. Agreement, ECF No. 46-10 ("The completion of Manpower's application process shall constitute a conditional offer of employment. . . .").[5]  On November 2, 2022, Dominguez also received and signed Manpower's Associate Handbook.  *See* Associate Handbook, ECF No. 46-12.  Pursuant to the Handbook, when an employee is sick, unavailable, or needs time off, the employee should call a Manpower Representative an hour before shift.  *See id.* at 5; Cox Dep. 24:8 – 28:13.  The Manpower Representative should also be contacted if the employee needs a reasonable accommodation.  *See* Assoc. Agreement 26. ("Because the need for an accommodation is often not apparent, it is the responsibility of the Associate to make Manpower aware of the disability and to request an accommodation.").

Employees assigned by Manpower to work at Eagle River are also provided with copies of Eagle River's handbook and directed to comply with both companies' respective policies, including the "call-off" and attendance policies.  *See* Manpower Stmt Facts ¶ 2; Resp. Manpower Stmt Facts ¶ 2.  Eagle River had a written Call-Off Procedure/Policy, which Dominguez received, read, and signed on November 7, 2022.  *See* Call-Off Procedure/Policy, ECF No. 42-19.  Under the call-off policy, employees are required to call off preferably fifteen (15) minutes before the start of their shift.  *See id.*; Fausnacht Dep. 29:1-17.  The same

---

[5]     The Associate Agreement contains the following Availability policy:
> To maintain employment status with Manpower, you must keep us informed as to your availability.  When you complete an assignment, notify Manpower by phone within 48 hours . . . and then every week until you are placed in a new assignment, to inform us of your availability status.  If you do not contact us, then we will consider you unavailable for work and to have voluntarily resigned from employment.

*See* Assoc. Agreement.

procedures apply whether the person is an employee[6] of Eagle River or on assignment from Manpower.  *See id.* at 30:11-16 (explaining that the staffing agency might also want the person to contact them, but Eagle River wants to be contacted directly because staffing agencies are not usually open when it starts).  More specifically, the employee must call Eagle River prior to the shift even if the employee is with a temp agency, such as Manpower.  *See* Somers Dep. 29:24 – 30:10, ECF No. 38-8.  If no one answers the call-in number, employees are expected to leave a message with their reason for calling off and details as to whether whether they are going to be late or out for day.  *See* Fausnacht Dep. 29:18-23.  Eagle River's Attendance Policy states: "An employee who is absent for three consecutive days without notifying the company will be presumed to have abandoned their position with the company and will be separated from employment with the company on the third day of absence."  *See* Attendance Policy, ECF No. 42-20.  It further provides: "Excessive absenteeism or tardiness will result in discipline up to and including termination. Failure to show up or call in for a scheduled shift without prior approval also may result in discipline up to and including termination."  *See id.*  On November 7, 2022, Dominguez also received, read, and signed Eagle River's written Attendance Policy.  *See id.* The Attendance Policy utilizes a point system in which employees are generally terminated if they get fifteen (15) points.  *See id.*; Fausnacht Dep. 37:5 – 42:22.  If the employee has a doctor's note excusing an absence, no points are assigned.  *See* Attendance Policy.  "[I]f there are more than three absences in a quarter or six in a year, that would be considered excessive and they could be terminated."  *See* Fausnacht Dep. 43:1-4.  Dominguez was aware that excessive

---

[6]    Any reference to "employee" in relation to Eagle River's policy is interchangeable with a person on assignment from Manpower.

absenteeism or tardiness would result in discipline, up to and including termination.  *See*
Dominguez Dep. 300:4-7.

On November 7, 2022, Dominguez started working at Eagle River's facility.[7]  *See*
Dominguez Dep. 183:18 – 184:9.  Her job duties included "put[ting] finishing touches
[internally] on the [mobile homes]," by adding "touch up paint" and fixing molding.  *See id.* at
185:18-186:20.  Manpower, not Eagle River, paid Dominguez for her work at Eagle River.  *See*
Assoc. Agreement ("In consideration of a temporary assignment with a Manpower client, I agree
that I am solely an associate of Manpower for any benefits plan purposes. . . ."); Bankes Dep.
42:24 – 43:2.  Dominguez called out on December 6, 2022, stating that she would be absent from
work at Eagle River due to "stomach pains."  *See* Dominguez Dep. at Ex. 12.  She called out
again on December 12, 2022, stating that she would not be into work because she was taking her
sister to a doctor's appointment.  *See id.*  On December 16, 2022, Dominguez received a warning
for excessive absenteeism, noting five points.  *See* Dominguez Dep. 300:12-14 and at Ex. 29.[8]
Dominguez was in her probationary period with Eagle River at all points relevant to this action.
*See* Fausnacht Dep. 45:13-21 (Fausnacht testified to a one-hundred-twenty (120) day

---

[7]     Counsel for Dominguez disputes the suggestion that Manpower assigned her to work at
Eagle River because Dominguez applied to work directly through Eagle River and was referred
to Manpower as a condition of her employment with Eagle River.  *See* Resp. Manpower Stmt
Facts ¶ 2, ECF No. 43-3.  This dispute is not "material" to deciding the Motions for Summary
Judgment.  *But see* footnote 17 below.  This Court will attempt to word the facts in a way that
satisfies both parties, but when that is not feasible and for sake of clarity and consistency, this
Opinion adopts Defendants' terminology that Dominguez's work at Eagle River was an
"assignment."  In so doing, this Court in no way implies a material distinction in the term for
purposes of its analysis.

[8]     The parties dispute whether Dominguez did not appear for work at Eagle River on
January 3, 2023, without calling out and whether, on January 11, 2023, she called out because
her stomach was hurting.  *See* Dominguez Dep. at Ex. 12; Eagle River Timesheet, ECF No. 42-
14.  There is no dispute that she called out on January 12, 2023, to go to a doctor's appointment.
*See id.*  Dominguez submitted a doctor's note for this absence.  *See* Resp. Manpower Stmt Facts
¶ 13; Eagle River Timesheet.

probatory period for Dominguez.); Dominguez Dep. 259:23 – 260:24 (Dominguez testified to a three-month probationary period.).

### B.    Medical treatment following Dominguez's car accident on January 17, 2023

On or about January 17, 2023, Dominguez was the front-seat passenger in a stopped vehicle that was rearended by another vehicle.  *See* Dominguez Dep. 66:3-7, 67:9-10, 68:20-22. Dominguez hit her head on the passenger-side window, with no bleeding.  *See id.* at 74:5 – 75:3. Her head and neck hurt, but Dominguez refused to go to the hospital by ambulance, and was advised that if her head was hurting badly or she started to get nauseous to go the hospital.  *See id.* at 70:12-24, 75:13-18.  Later that night,[9] Dominguez went to the emergency room at Lancaster General Hospital ("LGH") where, according to her deposition testimony, Dominguez reported: "my head was hurting really bad; I was nauseous; my neck and my back were hurting; my shoulder was hurting; I felt, like, really dizzy; the light was bothering me."[10]  *See id.* at 75:7-17, 77:9-14.  LGH took CT scans of her head and cervical spinal and x-rays of her right shoulder, all of which showed no abnormalities.  *See id.* at 211:23 – 212:13 and Ex. 14.  LGH made a differential diagnosis of a concussion, found no need for hospitalization, released her without prescribing any medication, and advised her to follow up with her primary care physician.[11]  *See* Dominguez Dep. at Ex. 14.  LGH provided Dominguez a doctor's note

---

[9]    Dominguez arrived on January 17, 2023, but was released (from the waiting room) after midnight on January 18, 2023.  *See* Dominguez Dep. at Ex. 14.

[10]    According to the medical records, Dominguez "appear[ed] in no acute distress."  *See* Dominguez Dep. at Ex. 14.  "Upon reexamination, her pain had improved."  *Id.*

[11]    The medical records stated that Dominguez could "ambulate without difficulty."  *See* Dominguez Dep. at Ex. 14.  However, Dominguez testified that this was not "completely accurate" because although she walked into and out of the emergency room on her own, they had to get her a wheelchair in the emergency room.  *See* Dominguez Dep. 209:18 – 210:11.

confirming her emergency room evaluation and stating that she could return to work on January 19, 2023.  *See* Dominguez Dep. at Ex. 16 (written by Joseph R. Horst, CRNP).

On January 19, 2023, Dominguez had an appointment with her primary care physician at Union Community Care, but saw the nurse practitioner.  *See id.* at 215:14 – 216:19.  According to her medical records from this appointment, Dominguez was "able to ambulate without difficulty" and reported "feeling nauseous, light is bothering her, [and] a little bit dizzy."  *See* Dominguez Dep. at Ex. 17.  She reported having a headache, but it was "not the worst headache ever, similar to previous headaches."  *See id.*  She was given medication for her nausea and vertigo.  *See* Dominguez Dep. 216:20 – 217:8.  Union provided Dominguez a doctor's note excusing her from work on January 19 and 20, 2023, and clearing her to return to work on January 23, 2023.  *See* Dominguez Dep. at Ex. 16 (written by Chantal Kabamba, CRNP).

Dominguez, who testified that she did not feel well enough, did not return to work on January 23, 24, 25, or 26, 2023.  *See* Dominguez Dep. 224:8-22.  She testified that her symptoms were "very severe" for "the initial first week-and-a-half period, maybe a little, tiny bit longer than that."  *See id.* at 26:19 – 27:2.  Dominguez testified that for the first couple of days it was "hard to walk straight," that she was imbalanced because of vertigo and was bumping into things.  *See id.* at 105:8-24.  She testified that she was unable to ambulate, lift, and concentrate.  *See id.* at 106:5 – 108:14, 110:10-15.  Dominguez testified that she had blurred vision, light and sound bothered her, and that she was "like, incapacitated, basically" because of her headaches.  *See id.* at 81:10-15, 104:5-15.  She testified that for the first month after the accident, she would get dizziness with her migraines on a daily basis.  *See id.* at 103:11-20.  However, there are no medical records indicating that she could not see, concentrate, ambulate, or lift because of the car accident, or that she had any long-term limitations.  *See id.* at 326:2-22.

On January 27, 2023, Dominguez was treated again by CRNP Kabama at Union.  *See* Dominguez Dep. at Ex. 17.  Dominguez testified that she "felt a little better" and ""was able to perform the basic functions," but was "still feeling things" and that during this visit she was advised that "there was no set amount of time for [her] symptoms to go away, so just do what [she] could to, like, help manage it."  *See* Dominguez Dep. 27:3-7, 231:4-6.  According to the January 27 medical records, Dominguez reported feeling "much better," and her headache, nausea, and dizziness had "improved."  *See* Dominguez Dep. at Ex. 17.  The records stated that she had "no nausea, . . . no sensitivity to light,. . . no confusion,. . . no dizziness.  *See id.*  CRNP Kabama reviewed concussion care instructions with Dominguez.  *See id.*  CRNP Kabama¸ who was advised that Dominguez had been terminated because she missed work, provided Dominguez a doctor's note excusing her from work January 23 to 27, 2023.  *See* Dominguez Dep. at Ex. 18 (written by Chantal Kabamba, CRNP).  A copy of this note was given to Eagle River by Dominguez on January 27, 2023.  *See id.* at 329:23 – 330:3.

After January 27, 2023, Dominguez did not see a doctor again.  *See* Dominguez Dep. 287:22-24.  She did not require surgery, nor did she receive physical or occupational therapy for any of the injuries sustained on January 17, 2023.  *See id.* at 102:24 – 103:9.  Dominguez testified that since the accident, she still suffers "really bad migraines," which causes blurred vision, nausea, and sensitivity to light/sound.  *See id.* at 79:6-16, 355:4-10.  She does not take medication to treat the migraines and, instead, "just lock[s her]self up."  *See id.* at 80:8-14.

### C.    Communications with Defendants after Dominguez's car accident

On January 18, 2023, Dominguez called out of work and left a voicemail for Manpower stating:

> Hi, my name is Verania Dominguez. My phone number is 3473394979. I'm just calling to let you guys know [that] I'm not going to be going into ERH today,

> January 18th, because I got in a car accident so I'll be back tomorrow with a note from my doctor. Thank you.

Cox Cert. ¶ 7a and Ex. 1, ECF No. 38-5; Ex. S, ECF No. 43-23.  She did not talk to anyone at

Manpower at that time.   *See* Dominguez Dep. 114:16-18.  On January 18, 2023, Dominguez

also called and left a message with Eagle River stating: ". . . I got in car accident yesterday and

just left the emergency room so I'm coming in with a note on Thursday because I have

concussion and cannot go in today."  *See* Ex. Q, ECF No. 43-21.

On January 19, 2023, Dominguez called out of work and left a voicemail for Manpower

stating:

> Hi, my name is Verania Dominguez. My phone number is 3473394979. I'm just calling to let you guys know that I'm not going into ERH today because unfortunately I was rear ended on the 17th which caused me to get a concussion. And I'm extremely nauseous and lightheaded so I will be going to the doctors today to get some medicine. I will have a doctor's note for them when I get back so. If you guys have any questions just let me know. Thank you.

Cox Cert. ¶ 7b and Ex. 1; Ex. W, ECF No. 43-27.  The same day, she also called Eagle River and

left a message stating: ". . . I'm not going to be able to make in today because I have a

concussion that I acquired on the seventeenth from being rearended and I'm having real bad

nausea and lightheadedness so I'm gonna go see my doctor later."  *See* Ex. U, ECF No. 43-25.

On January 20, 2023, Dominguez called out of work and left a voicemail for Manpower

stating:

> Good morning, my name is Verania Dominguez. My phone number is 3473394979. I'm just calling to let you guys know that I will not be at ERH today either. I got a concussion on Tuesday and my doctor gave me a note to give ERH on Monday when I go back. Thank you. If you have any questions, just let me know.

Cox Cert. ¶ 7c and Ex. 1; Ex. Y, ECF No. 43-29.  The same day, she also called Eagle River and

left a message stating: ". . . My doctor gave me a note that I will give you guys on Monday for

the rest of the week off."  *See* Ex. X, ECF No. 43-28.

On January 23, 2023, Santiago emailed Karli Bankes, Eagle River's HR administrator, reporting that Dominguez called off as she was "still suffering for the car accident." *See* Ex. Z, ECF No. 43-30.  Bankes responded that she would contact Dominguez about her expected return.  *See id.*  On or about January 23, 2023, Dominguez's sister gave Bankes the January 18, 2023 LGH note that indicated Dominguez could return to work on January 19, 2023, and the January 19, 2023 note from Union that stated Dominguez could return to work on January 23, 2023.  *See* Dominguez Dep. 315:7-20.  Bankes called Dominguez and left a voicemail message asking for a return call because she had a few questions about her being out because Dominguez's sister gave Bankes a doctor's note that Dominguez would be able to return on Monday.  *See* Ex AA, ECF No. 43-31.

On January 24, 2023, Dominguez called out of work and left a voicemail for Manpower stating:

> Good morning, my name is Verania Dominguez. My phone number is 3473394979. I'm calling because I will not be able to make it to ERH today either. I'm still waiting on my doctor but I did tell them I was going to send my doctor's excuses for last week. So let me know if you guys have any questions. Thank you.

Cox Cert. ¶ 7d and Ex. 1; Ex. CC, ECF No. 43-33.  The same day, she also called Eagle River and left a message stating: ". . . I still have to see my doctor so I'm not going to be able to make it in today but I will be able to send my notes for last week in with my sister." *See* Ex. BB, ECF No. 43-32.  On January 24, 2023, Santiago emailed Bankes that Dominguez called off because she was "still waiting on doc." *See* Ex. Z.  Bankes replied that it was "very interesting" she called out because Dominguez's sister gave Bankes a note clearing Dominguez to work.  *See id.*

On January 25, 2023, Dominguez called out of work and left a voicemail for Manpower stating:

> Good morning, my name is Verania Dominguez. My phone number is 3473394979. I'm calling because I'm not going to be going to Eagle River probably for the rest of the week. I spoke to Karli yesterday and I told her my situation because I'm still having all the symptoms that I stated before and she [said] that we would touch base on Thursday after I visit my doctor. Let me know if you guys have any questions. Thank you.

Cox Cert. ¶ 7e and Ex. 1.; Ex. DD, ECF No. 43-34.

On January 26, 2023, Dominguez called out of work and left a voicemail for Manpower

stating:

> Good morning, my name is Verania Dominguez. My phone number is 3473394979. I'm calling because I will not be making it to ERH today either. I already let them know. [Yeah a]nd I have doctor's notes for them and stuff because of my concussion earlier this week. Let me know if you guys have any questions. Thank you.

Cox Cert. ¶ 7f and Ex. 1; Ex. GG, ECF No. 43-37.  The same day, she also called Eagle River

and left a message stating: ". . . I will not be making it in today because I'm gonna go see the

doctor so I will be getting back in touch with you guys later this afternoon and getting you the

details on all the notes and all of that."  *See* Ex. FF, ECF No. 43-36.

### D.    Dominguez's accommodation needs and requests

Dominguez testified that after the accident she needed a short medical leave as an

accommodation.[12]  *See* Dominguez Dep. 23:17-18.  The only accommodation she needed to

work was to not have to get on the ladder and to be able to wear sunglasses and earplugs.  *See id.*

at 30:20 – 31:1, 84:3-13.  She testified that she put her accommodation requests "in [her] phone

calls when [she] called off every day."  *See id.* at 263:5-20.  When questioned whether she

explained her inability to be on a ladder with Eagle River, Dominguez testified "Yes, multiple

---

[12]    On September 26, 2023, Dominguez filed a Charge of Discrimination with the EEOC against Eagle River and Manpower for discrimination based on retaliation, disability, and failure to accommodate.  *See* EEOC Charge, ECF No. 46-6.  The only requested accommodation identified in the EEOC Charge was a short medical leave.  *See id.*

times. . . . The messages would go to Karli Bankes, but it would be on those days where they'd make me call off every single day; I would always state my symptoms and why I didn't feel safe going into work." *See id.* at 26:1-6. The "messages" to which Dominguez referred were left on the call-off line." *See id.* at 28:1-19. Dominguez never made a written request for accommodations. *See id.* at 263:5-15, 264:5-9. She did not have a doctor's note indicating that she could not get on the ladder or that she needed to wear sunglasses and earplugs to return to work. *See id.* at 261:21-23, 264:22 – 265:1.

Dominguez testified that she "just couldn't be up on the ladder," but there was nothing else she could not do at work. *See id.* at 25:9 – 26:12. She testified that at no time after the accident was she completely unable to work even though she "had some restrictions." *See id.* at 177:17 – 178:7. However, between January 17 and 26, 2023, Dominguez never told Eagle River or Manpower that she could perform basic functions of the job or work in any capacity. *See id.* at 27:8-24; Eagle River Stmt Facts ¶ 36, ECF No. 46; Resp. Eagle River Stmt Facts ¶ 36, ECF No. 42-3. The only person Dominguez spoke to at either Manpower or Eagle River following the car accident was Bankes. *See* Dominguez Dep. 114:4-18.

Bankes testified that she was not aware Dominguez was asking for time off to attend doctor's appointments as an accommodation of her disability. *See* Bankes Dep. 46:14-20. She did not testify as to any specific accommodation requests by Dominguez, such as not climbing ladders or wearing sunglasses and earplugs. *See generally id.* Bankes testified that accommodation requests were typically handled by Kathy Fausnacht. *See id.* 21:11-19. Fausnacht did not testify as to any specific accommodation requests by Dominguez, such as not climbing ladders or wearing sunglasses and earplugs. *See generally id.* Rather, Fausnacht testified that she was never made aware that Dominguez suffered a concussion in a car accident

or experienced migraines.  *See id.* at 52:4-18.  Fausnacht testified that she had no knowledge that

Dominguez asked for time off to attend doctor's appointments.  *See id.* at 53:22 – 54:1.

 **E.**  **Dominguez's purported terminations**

 On or about January 26, 2023, Bankes approached Fausnacht to report that Dominguez

was supposed to report to work for the past three days, but had not.  *See* Fausnacht Dep. 50:3-5.

Fausnacht advised Bankes that by not coming to work for three straight days, Dominguez had

abandoned her position.  *See id.* at 50:6 – 51:8.  Bankes also spoke about Dominguez's possible

termination with the production superintendent for Eagle River, Roger Somers.  *See* Somers Dep.

14:4-14.  Somers decided that Dominguez, who even before the car accident "hadn't been at

work or had been late," should be terminated for attendance.  *See id.* at 54:3-25 ("My opinion,

and I hold it to this day with everybody that works for me, is you -- you can be the best employee

in the world, but if you're not at work, you know, you're – you're not -- you have no value to

me.").  Bankes informed Santiago that Eagle River had decided to let Dominguez go[13] and that

she could re-apply when cleared by a doctor.  *See* Emails; Santiago Dep. 44:18 – 45:5.

Manpower was not involved in Eagle River's decision to end Dominguez's assignment.  *See*

Eagle River Stmt Facts ¶ 39, ECF No. 46; Resp. Eagle River Stmt Facts ¶ 39, ECF No. 42-3.

 On January 26, 2023, Santiago advised Dominguez that Eagle River was letting her go

and once she had a doctor's note clearing her to work, she could reapply to Eagle River.  *See*

Santiago Dep. 45:16-20.  There is a dispute of fact as to whether Manpower told Dominguez at

---

[13] Eagle River states that it "separated" Dominguez from her assignment, but Dominguez refers to the decision as "termination."  This Court does not find the dispute in terms to be "material" to the Court's analysis.  *Accord* footnote 17 below.  For purposes of this Opinion, these terms are interchangeable, but for sake of clarity and consistency this Court will refer to the decision as "termination."  In so doing, this Court in no way implies a material distinction between the terms for purposes of its analysis.

this time that she could apply for other positions through Manpower.[14]  Santiago asked

Dominguez to send a copy of the doctors' notes to Manpower.[15]  As of January 26, 2023,

Dominguez had not provided Manpower with any doctor's notes.  *See* Dominguez Dep. 127:12-

17, 177:17 – 178:7, 196:14 – 198:10.  The three doctor's notes were emailed by Dominguez to

Santiago on March 1, 2023, for a matter unrelated to a new work assignment.  *See id.* at 234:18 -

235:5; Santiago Dep. 51:3-6; Ex. II, ECF No. 43-39.  On March 20, 2023, Manpower sent

Dominguez an email stating that she was never terminated by Manpower and that there was still

work available, but Dominguez did not respond.  *See* Dominguez Dep. at 246:8-22.  She never

contacted Manpower after January 26, 2023, because she did not "really want to have to deal

with [Manpower] again" and only wanted to work at Eagle River because her sister was working

there.  *See id.* at 18:16-23, 121:8-24.

On January 27, 2023, Dominguez applied for a position at Eagle River.  *See id.* at 83:17-

21.  On February 28, 2023, Dominguez applied for the cabinet position with Eagle River.  *See*

Employ. App., ECF No. 46-13.  Dominguez stated that she had "painting/ basic tool work."  *See*

---

[14]     Santiago testified that during this conversation, he advised Dominguez that there were other open positions available with other Manpower clients for which she could apply, as Dominguez was not terminated from Manpower.  *See* Santiago Dep. 55:16-23, 57:24 - 58:1. However, Dominguez testified that it was not until March 2023 when she was offered another position with a Manpower client.  *See* Dominguez Dep. 18:9-16, 119:2-9; Resp. Eagle River Stmt Facts ¶ 47.  *See also* Cox Cert. ¶ 8, ECF No. 38-5; Dom. Cert. ¶ 7, ECF No. 42-43.

[15]     Although Dominguez testified that she was not asked to bring in a return-to-work letter to get another assignment from Manpower, *see* Dominguez Dep. 119:6-9, Santiago testified that he advised Dominguez that "we would need a doctor's note. . . ," *see* Santiago Dep. 45:17-19. Regardless, there is evidence that Santiago sent a text message to Dominguez on January 26, 2023, at 11:56 AM stating ". . . once you're cleared by a doctor and again please make sure to send me a copy," Dominguez Dep. at Ex. 12, which is sufficient to eliminate any genuine dispute of fact on this issue.  *See Irving v. Chester Water Auth.*, 439 F. App'x 125 (3d Cir. 2011) (holding that "self-serving deposition testimony is insufficient to raise a genuine issue of material fact").

*id.* at 5.  The job description for the cabinet position listed the duties and responsibilities as including:

- Build cabinets accurately and within time frame
- Use saws, power tools, sanders, hand tools, wood glue, screws, and etc. to
- complete the project
- Cut, shape, and prepare the surfaces of wood for construction
- Eagle River Homes, LLC000159
- Attach specific door pulls and hardware
- Hang cabinet doors on frames

Job Description, ECF No. 46-14.  Dominguez was not hired for either position.

## III.    LEGAL STANDARDS

### A.    Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the

existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The court must consider the evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### B.      ADA Claim

The ADA[16] states: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a prima facie case of discrimination under the ADA a plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998). To state a claim for a failure to accommodate under the ADA, a plaintiff must allege sufficient facts to support a reasonable inference that: "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 157 (3d Cir. 2017). "To establish a prima facie

---

[16]      Congress issued the ADA Amendments Act ("ADAAA") in 2008 to the Americans with Disabilities Act of 1990 ("ADA") in response to Supreme Court cases that narrowed the broad scope of protection Congress intended to be afforded by the ADA. *See* 42 U.S.C. § 12101, Amendments Notes. While this Court is cognizant of the Amendments Act, it refers only to the ADA in this Opinion to avoid confusion as much of the cited case law, which was issued after or remains valid after the ADAAA, refers to the ADA. One notable change in the ADAAA pertains to the language in 42 U.S.C. § 12102(3), which is correctly cited herein.

case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

The ADA defines "disability" as either (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual;" (2) "a record of such an impairment;" or (3) "being regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "The determination of whether an individual is substantially limited in a major life activity must be made 'on a case-by-case basis.'" *Matthews v. Pa. Dep't of Corr.*, 613 F. App'x 163, 167 (3d Cir. 2015) (quoting *Albertson's Inc. v. Kirkingburg*, 527 U.S. 555, 566 (1999)).

An "individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). However, this section does "not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). "Examples of temporary, non-disabling impairments include: broken limbs, sprained joints, concussions, appendicitis, and influenza." 29 C.F.R. § 1630.2. To prevail on a regarded-as claim, the "plaintiff would have to show that his employer misinterpreted information about his limitations to conclude that he was unable to perform a 'wide range or

class of jobs.'" *Keyes v. Catholic Charities of the Archdiocese of Phila.*, 415 F. App'x 405, 410
(3d Cir. 2011).

The employer must have knowledge of the disability at the time of the adverse action.
*See Geraci v. Moody-Tottrup, Int'l*, 82 F.3d 578, 581 (3d Cir. 1996) (reasoning that "an
employer cannot fire someone because of a disability it knows nothing about"). "Adverse
employment decisions in this context include refusing to make reasonable accommodations for a
plaintiff's disabilities." *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 761
(3d Cir. 2004). "Reasonable accommodation . . . includes the employer's reasonable efforts to
assist the employee and to communicate with the employee in good faith, . . . under what has
been termed a duty to engage in the 'interactive process.'" *Id.* (quoting *Mengine v. Runyon*, 114
F.3d 415, 416 (3d Cir. 1997)). As part of this interactive process, the employee must make clear,
either by direct communication or other appropriate means, that she wants assistance for her
disability. *See Colwell v. Rite Aid Corp.*, 602 F.3d 495, 506 (3d Cir. 2010). The employer "must
have enough information to know of both the disability and desire for an accommodation, or
circumstances must at least be sufficient to cause a reasonable employer to make appropriate
inquiries about the possible need for an accommodation." *Id.* (quoting *Conneen v. MBNA Am.
Bank, N.A.*, 334 F.3d 318, 332 (3d Cir. 2003)).

### C.    ADA Legitimate Reasons

If an employee makes out a prima facie case under the ADA, the employer can rebut the
prima facie case by providing a legitimate, nondiscriminatory reason for its conduct. *See Capps*,
847 F.3d at 156 (applying the burden-shifting analysis of *McDonnell Douglas* to ADA claims for
discrimination, failure-to-accommodate, and retaliation); *Fasold v. Justice*, 409 F.3d 178, 184
(3d Cir. 2005) ("Under the McDonnell Douglas paradigm, an employee must first establish a

prima facie case of discrimination, after which the burden shifts to the employer to articulate a

legitimate, nondiscriminatory reason for its adverse employment decision.").  "If the employer

articulates one or more such reasons, the aggrieved employee must then proffer evidence that is

sufficient to allow a reasonable finder of fact to find by a preponderance of the evidence that the

employer's proffered reasons are false or pretextual."  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d

760, 764 ( 3d Cir. 2004).  "It is important to note that although the burden of production may

shift during the McDonnell Douglas inquiry, the ultimate burden of persuading the trier of fact

that the [employer] intentionally discriminated against the [employee] remains at all times with

the [employee]."  *Id.*

An employee "may defeat a motion for summary judgment by either (i) discrediting the

proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether

circumstantial or direct, that discrimination was more likely than not a motivating or

determinative cause of the adverse employment action."  *Fuentes v. Perskie*, 32 F.3d 759, 764

(3d Cir. 1994).  "[T]he plaintiff's evidence rebutting the employer's proffered legitimate reasons

must allow a factfinder reasonably to infer that each of the employer's proffered non-

discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually

motivate the employment action (that is, the proffered reason is a pretext)."  *Id.* (internal citations

omitted).  "It is not sufficient to show that the employer's decision was wrong, mistaken,

imprudent or incompetently made."  *Rabinowitz v. AmeriGas Partners, L.P.*, 252 F. App'x 524,

527 (3d Cir. 2007).  The employee "must demonstrate such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason

for its action that a reasonable factfinder could rationally find them unworthy of credence and

hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (internal citations and quotations omitted).

## IV.    ANALYSIS

There is a dispute of fact as to whether Eagle River was a joint employer with Manpower.[17]  Regardless, Dominguez has not established a prima facie case under the ADA against either Eagle River or Manpower for discrimination or failure to accommodate because there is no evidence that she was disabled.  Because disability is not a required showing for an ADA retaliation claim and there is a dispute of fact as to whether Dominguez engaged in protected activity, summary judgment is denied on the retaliation claim against Eagle River.  It is granted as to Manpower, however, because there is insufficient evidence showing that Manpower caused any adverse action and, regardless, it had legitimate, non-discriminatory reasons for its decisions.

---

[17]    Dominguez admitted that she was not an employee of Eagle River; rather, she was an employee of Manpower.  *See* Dominguez Dep. 262:9 – 263:4; 324:17-20; Em. App. 2, ECF No. 46-13 (When asked whether she had ever worked for Eagle River in her Application for Employment dated February 28, 2023, Dominguez responded "No."  She wrote: "i was employed through manpower from november to january working outside in the yard, and was told to reapply when my concussion cleared" [sic].).  The Associate Agreement she signed with Manpower similarly provided: "In consideration of a temporary assignment with a Manpower client, I agree that I am solely an associate of Manpower for any benefits plan purposes. . . ."  *See* Assoc. Agreement.  However, Dominguez's attorney suggests that she was hired directly by Eagle River and only referred to Manpower as a condition of her employment with Eagle River.  *See* Resp. Manpower Stmt Facts ¶ 2.  Moreover, although Manpower maintained employee records and managed payroll, Eagle River controlled many aspects of Dominguez's employment, such as supervision of work.  *See* Staffing Services Agreement ¶¶ 1-2, ECF No. 46-9.  *See also Nationwide Mut. Ins. Co. v. Darden*, 503 US 318, 323 (1992); *In Re Enterprise Rent-A-Car Wage & Hour Empl. Practices Litig.*, 683 F.3d 462, 468-70 (3d Cir. 2012).  The argument that summary judgment should be granted because Dominguez failed to show that Eagle River was her employer is therefore denied due to a dispute of fact.  *See Talarico v. Pub. P'ships, LLC*, 837 F. App'x 81, 86 (3d Cir. 2020) (finding that there was a dispute of fact as to whether the defendant was a joint employer because the "total employment situation" indicated that the plaintiff may be the defendant's "employee, even if not all of the *Enterprise* factors support that conclusion").

**A.      Dominguez has not shown that she was disabled under the ADA.**

"It is, of course, an axiom of any ADA claim that the plaintiff be disabled and that the employer be aware of the disability." *Jones v. UPS*, 214 F.3d 402, 406 (3d Cir. 2000).[18]  "The relevant time for determining whether the plaintiff is a qualified individual with a disability is the time of the adverse employment decision." *Rocco v. Gordon Food Serv.*, 609 F. App'x 96, 98 (3d Cir. 2015) (internal quotations omitted).  *See also Coleman v. Children's Hosp. of Phila.*, No. 22-1445, 2023 U.S. Dist. LEXIS 201275, *6 (E.D. Pa. Nov. 8, 2023) ("The threshold question is whether Plaintiff was disabled at the time of her termination.").  Dominguez alleges that she was "disabled" at the end of January 2023 based on both actual and perceived disability.

**i.      Dominguez was not substantially limited in a major life activity.**

Dominguez testified that she suffers severe migraines as a result of the concussion she sustained in the car accident, which limited her ability to ambulate, lift, and concentrate, and which still impairs her vision and causes nausea and sensitivity to light and sound.  However, aside from her own testimony, Dominguez points to no evidence to create a genuine issue for trial.  *See Irving v. Chester Water Auth.*, 439 F. App'x 125 (3d Cir. 2011) (holding that "self-serving deposition testimony is insufficient to raise a genuine issue of material fact"); *Solomon v. Soc'y of Auto. Eng'rs*, 41 F. App'x 585 (3d Cir. 2002) (concluding that the plaintiff failed to establish his prima facie case of discrimination based solely on his own testimony); *Evans v. MAAX-KSD Corp.*, No. 06-cv-2804, 2008 U.S. Dist. LEXIS 6333, *13-14 (E.D. Pa. Jan. 25, 2008) (granting the defendant's motion for summary judgment on the ADA discrimination claim because there was "not one shred of evidence outside of Plaintiff's own deposition testimony"

---

[18]      *But see Shellenberger v. Summit Bancorp*, 318 F.3d 183, 190 (3d Cir. 2003) ("[T]he absence of a disability does not translate into an absence of protection under the ADA.").

that he was substantially limited in a major life activity).  "If we allow an employee to establish a disability relying solely on his own testimony, there would be no reasonable limit to a 'disability' under the Disabilities Act."  *Parrotta v. PECO Energy Co.*, 363 F. Supp. 3d 577, 593 (E.D. Pa. 2019) (granting the defendant's motion for summary judgment on the ADA claim).

None of the medical records support Dominguez's testimony that she could not see, concentrate, ambulate, or lift.  *See* Dominguez Dep. at Exs. 14 and 17.  There is no mention of Dominguez having a "migraine" in any of her medical records.  *See id.*  Although the medical records from January 19, 2023, confirm that Dominguez had a headache, it was "not the worst headache ever, [but] similar to previous headaches."  *See* Dominguez Dep. at Ex. 17.  According to the medical records dated January 27, 2023, Dominguez "felt a little better" and "was able to perform the basic functions."  *See id.*  She had no nausea, sensitivity to light, or dizziness.  *See id.*  There are no medical records after January 27, 2023, because Dominguez did not see a doctor again, did not require surgery, did not receive physical or occupational therapy, and did not even take medication to treat her allegedly debilitating migraines.  *See id.* at 80:8-14, 102:24 – 103:9.  Additionally, none of the doctor's notes suggest that Dominguez was substantially limited in a major life activity.  To the contrary, each doctor's note cleared her to work without restrictions within one or two business days.[19]  *See Shannon v. City of Phila.*, No. 98-5277, 1999 U.S. Dist. LEXIS 18089, at *13-14 (E.D. Pa. Nov. 23, 1999) (determining that the the employee's "impairment [was] a temporary injury with minimal residual effects, it would not be the basis for a sustainable claim under the ADA").  Without any medical evidence, Dominguez's

---

[19]     The January 27, 2023 note backdated Dominguez's excuse from work between January 23 to 27, 2023, but it was issued after her termination and was written with knowledge of her termination.  Moreover, the medical records from the January 27, 2023 appointment stated that Dominguez's headache, nausea, and dizziness had "improved" and she "was able to perform the basic functions."  *See* Dominguez Dep. at Ex. 17.

testimony is insufficient to establish that she is disabled.  *See Parrotta*, 363 F. Supp. 3d at 593

(holding that "a plaintiff cannot establish disability relying solely on his own testimony without

any medical documentation of his impairment at the time of the adverse action"); *Evans*, 2008

U.S. Dist. LEXIS 6333, at *13-14 (finding that the plaintiff, who over the course of a year had

two surgeries and several periods of complete disability, failed to make a prima facie showing

that he was disabled under the ADA in the absence of evidence, aside from his own testimony

and three doctor's notes stating that he needed work restrictions, that he was substantially limited

in a major life activity).

Moreover, Dominguez's own testimony that the only accommodations she needed to

perform her job was not climbing ladders and wearing sunglasses/earplugs contradicts her

suggestion that she was substantially limited.  *See Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506,

512 (3d Cir. 2001) ("A plaintiff attempting to establish disability on the basis of 'substantial

limitation' in the major life activity of 'working' must, at minimum, allege that he or she is

'unable to work in a broad class of jobs.'" (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471

(1999)).  Dominguez testified that she "just couldn't be up on the ladder," but there was nothing

else she could not do at work.  Climbing a ladder is not a major life activity, nor does the

inability to climb a ladder substantially limit her ability to work a broad class of jobs.  *See

Weisberg v. Riverside Twp. Bd. of Educ.*, 180 F. App'x 357, 363 (3d Cir. 2006) (determining that

the employee, who suffered from post-concussion syndrome and was unable to climb a ladder or

do yard work without help, was not disabled because being "unable to climb ladders" is a

"narrow and minimal limitation").  Further, Dominguez gave inconsistent testimony about

whether or not she was substantially limited by testifying that she was basically "incapacitated"

by her migraines and also that at no time after the accident was she completely unable to work,

*see* Dominguez Dep. 81:10-15, 104:5-15, 177:17 – 178:7.  *See Moses v. Wayfair LLC*, No. 20-5278, 2024 U.S. Dist. LEXIS 160403, at *27-28 (D.N.J. Sep. 6, 2024) (granting the defendant's request for summary judgment based on the plaintiff's failure to show he was disabled under the ADA where the plaintiff's own deposition testimony belied his claim that his visual impairment substantially impaired his ability to perform his job).

In the absence of any medical documentation to support Dominguez's self-serving and sometimes contradictory testimony, she has failed to show that her concussion substantially limited her life activities, as required to establish an actual disability.

### ii.    Dominguez was not perceived as disabled and her regarded-as argument fails because her impairment was transitory and minor.

Dominguez offers no evidence that either Manpower or Eagle River perceived her as disabled.  To the contrary, when Dominguez called off work on January 24, 2023, Bankes told Santiago that it was "very interesting" she called off because the doctor had cleared her to work as of January 23, 2023.[20]  *See* Ex. Z.  This shows that Eagle River thought Dominguez was able to work, which contradicts her claim that it perceived her as disabled.  At most, the evidence suggests that Manpower and Eagle River perceived Dominguez's condition to be temporary, which is insufficient to state a regarded-as claim.  *See Hudson v. Catch, Inc.*, No. 16-2032, 2016 U.S. Dist. LEXIS 141522, at *18-20 (E.D. Pa. Oct. 7, 2016).

Moreover, even if Manpower and Eagle River perceived Dominguez as disabled, the regarded-as claim fails as a matter of law because her disability, if any, was "transitory and minor."  *See Eshleman v. Patrick Indus.*, 961 F.3d 242, 246 (3d Cir. 2020) (citing 42 U.S.C. §

---

[20]    The doctor's notes received by Eagle River prior to Dominguez's termination cleared her to work as of January 23, 2023.  Although Manpower did not receive these notes prior to Dominguez's alleged termination, it was aware that she had been cleared to work as of January 23, 2023.  *See* Ex. Z.

12102(3)(A) (providing that this section does "not apply to impairments that are transitory and minor)). The "EEOC has suggested, for example, that . . . concussions . . . [are] impairments of a temporary nature 'with little or no long term or permanent impact.'" *See Williams*, 380 F.3d at 765 (quoting EEOC Interpretive Guidance, 29 C.F.R. Pt. 1630, App. § 1630.2(j)). Dominguez's medical records between January 17 and 27, 2023, revealed no long-term limitations, no abnormalities, and no need for surgery, therapy, or additional medical treatment, and the doctor's notes issued during this time cleared Dominguez to work. By January 27, 2023, only ten (10) days after the car accident, Dominguez reported feeling much better. *See* Dominguez Dep. at Ex. 17. Her headache, nausea, and dizziness had improved and she was able to function. *See id.* After January 27, 2023, Dominguez did not see a doctor again regarding her concussion, nor did she need or have any treatment for any of the injuries sustained in the car accident on January 17, 2023. *See* Dominguez Dep. 102:24 – 103:9, 287:22-24. Accordingly the evidence shows that Dominguez's impairment was both transitory and minor, precluding her regarded-as claim as a matter of law.

Without evidence that Dominguez was disabled under the ADA,[21] Dominguez has failed to establish the first required element of her discrimination and failure-to-accommodate claims. Summary judgment is granted in favor of Manpower and Eagle River on these claims.

---

[21]    Dominguez also failed to provide evidence that either Manpower or Eagle River knew she was disabled. *See Rinehimer v. Cemcolift*, 292 F.3d 375, 380 (3d Cir. 2002) ("[T]o establish discrimination because of a disability, an employer must know of the disability."); *Capps*, 847 F.3d at 157 (To state a failure-to-accommodate claim, the plaintiff must show "he was disabled and his employer knew it.").

**B.     There is a dispute of fact a that precludes summary judgment on the retaliation claim as to Eagle River only.**

The absence of a disability is not fatal to an ADA retaliation claim.  *See Williams*, 380 F.3d at 759 n.2 (holding that "an ADA retaliation claim based upon an employee having requested an accommodation does not require that a plaintiff show that he or she is 'disabled' within the meaning of the ADA").  "While a plaintiff does not need to establish that he or she is a qualified, disabled individual to establish a claim of retaliation under the ADA, the plaintiff must have requested the accommodation in good faith belief that he or she requires an accommodation."  *Davis v. Nat'l HME*, No. 3:23-cv-40, 2023 U.S. Dist. LEXIS 208681, *22 (W.D. Pa. Nov. 21, 2023) (internal citations omitted). *See also Shellenberger*, 318 F.3d at 190 ("The requirement of a good faith request for an accommodation means that the protection from retaliation afforded under the ADA does not extend to an employee whose request is motivated by something other than a good faith belief that he/she needs an accommodation.").

There is a dispute of fact as to whether Dominguez engaged in protected activity by requesting an accommodation.[22]  Dominguez testified that she put her accommodation requests "in [her] phone calls when [she] called off every day."  *See* Dominguez Dep. 263:5-20.  In her call-off messages, Dominguez gave only the following information:

- January 18- suffered a concussion on January 17
- January 19- suffered a concussion on January 17, feeling extremely nauseous (or real bad nausea) and lightheaded, will be going to the doctor today to get some medicine
- January 20- suffered a concussion on January 17, has doctor's note out of work for week
- January 24- still waiting to see doctor

---

[22]     Dominguez also suggests that Eagle River retaliated against her for union activity in the previous weeks, but union activity is not protected conduct under the ADA.  *Accord Walley v. Amazon.Com, Inc.*, No. 23-2955, 2024 U.S. App. LEXIS 13781, at *2 (3d Cir. June 6, 2024) (affirming dismissal of ADA claim of retaliation for filing a worker's compensation claim because filing a worker's compensation claim is not a protected activity under the ADA").

- January 25- probably out for the rest of the week, "still having all the symptoms that I stated before," will touch base on Thursday after I visit my doctor
- January 26- going to see the doctor

*See* Exs. Q, S, U, W, X, Y, CC, DD, FF, and GG. *See also* Ex. Z.[23]  At no point in any of these messages does Dominguez suggest that she could come back to work with accommodations, such as not climbing on a ladder or needing earplugs.  The only possible accommodation request was for medical leave.  *See id.*  Dominguez's calls on January 18 and 20, 2023, *see* Exs. Q, S, X, Y, are insufficient to constitute an accommodation request for medical leave because they are each limited to taking off the day of the call and make no mention of needing future medical leave or treatment.  *See Jones v. Children's Hosp. of Phila.*, No. 17-5637, 2019 U.S. Dist. LEXIS 107347, at *29 (E.D. Pa. June 26, 2019) (concluding that because merely calling in sick cannot be construed as a request for an accommodation, the "plaintiff's two calls and the two sick days cannot serve as the basis for plaintiff's claim of retaliation for requesting an accommodation"); *Torres v. Cty. of Berks*, No. 5:17-cv-01890, 2018 U.S. Dist. LEXIS 12823, at *15-17 (E.D. Pa. Jan. 26, 2018) (rejecting the plaintiff's claim that by virtue of calling out sick she requested a reasonable accommodation of time off for medical reasons).

However, Dominguez's call on January 19, 2023, stated that she was unable to go to work and would be going to the doctor that day to get medicine for her concussion symptoms. *See* Exs. U, W.  Her call on January 24, 2023, indicated that she was out because she was still waiting on her doctor.  *See* Exs. BB, CC.  Dominguez's call on January 25, 2023, to Manpower only, indicated that she needed future medical leave, would probably be out for the rest of the

---

[23]    It is unclear whether Dominguez called out on or about January 23, 2023.  There is no voicemail message in evidence from that day, but Santiago sent Bankes an email on January 23, 2023, stating that "two associates called in yesterday stating that they will not be in today.  They are still suffering for the car accident."  *See* Ex. Z.  Although the two associates are not named, a reasonable inference is that Dominguez was one of the two associates.

week, and planned to see her her doctor on Thursday.  *See* Ex. DD.  On January 26, 2023, Dominguez called reporting that she would not be in, *see* Ex. GG, and informing Eagle River she was going to see the doctor that day, *see* Ex. FF.  Construing the evidence in the light most favorable to Dominguez, a reasonable juror could conclude that she engaged in a protected activity on these dates by informing Manpower and Eagle River that she needed time off from work due to her injuries, in order to get treatment (such as "medicine"), and/or to allow her to see her doctor.  *See Davis v. Davis Auto, Inc.*, No. 10-CV-03105, 2011 U.S. Dist. LEXIS 135186, *29-30 (E.D. Pa. Nov. 22, 2011) ("A reasonable juror could conclude that Plaintiff engaged in a protected activity when she informed her employers she 'would need time off here and there for treatment and doctors' appointments.'"), *aff'd* 509 F. App'x 161 (3d Cir. 2013).  This is true even though Dominguez did not have a disability within the meaning of the ADA because in a retaliation claim, "as opposed to showing disability, a plaintiff need only show that she had a reasonable, good faith belief that she was entitled to request the reasonable accommodation she requested."  *Williams*, 380 F.3d at 751 n.2 (citing *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 191 (3d Cir. 2003)).  "A reasonable juror could infer that [Dominguez] made her request with the good faith belief that time off was necessary and appropriate."  *Davis*, 2011 U.S. Dist. LEXIS 135186, *30-31 (concluding that although the plaintiff failed to establish she was actually disabled or regarded as disabled under the ADA, the evidence was sufficient to show that she had a good faith belief that she was entitled to an accommodation to seek treatment for her asthma, anxiety, and a thyroid disorder).

Although there is little or no independent evidence of a retaliatory motive, the unusually suggestive temporal proximity of between one and ten days is sufficient to create a dispute of fact as to a causal connection between such protected activity and Dominguez's placement

termination by Eagle River (adverse action).  *See Blakney v. City of Phila.*, 559 F. App'x 183 (3d

Cir. 2014) ("We have found that a temporal proximity of two days is unusually suggestive of

causation, but have held that a temporal proximity greater than ten days requires supplementary

evidence of retaliatory motive."  (internal citations omitted)).  Dominguez has therefore stated a

prima facie case of retaliation against Eagle River and its Motion for Summary Judgment is

denied.[24]

### C.    Summary judgment on the retaliation claim is granted as to Manpower.

The evidence is insufficient to show that Dominguez suffered an adverse action by

Manpower and, regardless, Manpower had a legitimate reason for not placing Dominguez in

another assignment.

Manpower had no involvement in Eagle River's decision to terminate Dominguez's

assignment.  Although there is a dispute of fact as to whether Manpower advised Dominguez on

January 26, 2023, that it had other placements available, there is no dispute that it did

subsequently inform her of available placements.  More importantly, there is no dispute that

Dominguez chose not to continue her employment with Manpower independently of Eagle

River.  She testified that she only applied to Manpower because she was required to do so by

Eagle River and that she had no interest in working anywhere except at Eagle River.  *See*

---

[24]    Eagle River suggests that it had a legitimate, nondiscriminatory reason to terminate
Dominguez's assignment based on violations of its Attendance Policy because she failed to
report for her assignment even though she had doctor's notes clearing her for work as of
Monday, January 23, 2023.  However, there is a dispute of fact as to whether Dominguez failed
to call out for January 23, 2023, *see* footnote 23 *supra*, and although her call out on January 25,
2023, was to Manpower only, Dominguez did call out to Eagle River on January 24 and 26,
2023, breaking up the required "three consecutive days without notifying the company" for
deeming that an employee abandoned her position.  *See* Attendance Policy.  For this reason,
especially when combined with Dominguez's alleged accommodation requests for medical
leave, there is a dispute of fact as to whether Dominguez's absences were a legitimate reason for
terminating her assignment.  *See*

Dominguez Dep. 18:16-23, 94:22 – 95:5, 121:8-24 (Dominguez testified that she never contacted Manpower after January 26, 2023, because she did not "really want to have to deal with [Manpower] again" and only wanted to work at Eagle River because her sister was working there.). Her actions the day after her termination of reapplying to Eagle River directly and of providing Eagle River (only) with the doctor's note excusing her absences between January 23 and 26, 2023, confirm her lack of interest in continuing employment with Manpower. Dominguez never contacted Manpower again after January 26, 2023. The evidence therefore suggests that Dominguez voluntarily resigned from her employment with Manpower. "[V]oluntary resignations are not adverse actions." *Behm v. Mack Trucks, Inc.*, No. 22-2223, 2023 U.S. App. LEXIS 10528, *7 (3d Cir. May 1, 2023) (affirming summary judgment in favor of the employer on the ADA claim because the plaintiff made a reasoned and voluntary decision to retire (voluntarily resign)). *See also Leheny v. City of Pittsburgh*, 183 F.3d 220, 227-228 (3d Cir. 1998) ("Employee resignations and retirements are presumed to be voluntary. This presumption remains intact until the employee presents evidence to establish that the resignation or retirement was involuntarily procured." (internal citation omitted)).

    To the extent, however, there may be a dispute of fact as to whether Dominguez voluntarily resigned and/or was ever terminated by Manpower, Manpower had legitimate reasons for not placing her with another client. Specifically, Manpower's Associate Agreement, which Dominguez signed, states: "To maintain employment status with Manpower, you must keep us informed as to your availability. . . . If you do not contact us, then we will consider you unavailable for work and to have voluntarily resigned from employment." *See* Assoc. Agreement. Dominguez failed to contact Manpower after January 26, 2023, thereby violating the Associate Agreement. Additionally, despite Manpower's request on January 26, 2023,

Dominguez failed to provide Manpower with any doctor's notes clearing her to work until March 1, 2023. Both of these constitute legitimate reasons for not placing Dominguez in another assignment. *See Crowelle v. Cumberland-Dauphin-Harrisburg Transit Auth.*, No. 1:22cv864, 2024 U.S. Dist. LEXIS 185125, *22 (M.D. Pa. Oct. 10, 2024) (concluding that the employer articulated a legitimate, non-discriminatory reason for terminating the "plaintiff for being AWOL, i.e., violating its attendance policies"); *Baur v. Crum*, 882 F. Supp. 2d 785, 808 (E.D. Pa. 2012) (holding that the plaintiff's failure to undergo an independent psychological exam as ordered constituted insubordination, which is a valid reason for terminating an employee).

Summary judgment is therefore granted in Manpower's favor as to the ADA retaliation claim.

## V.    CONCLUSION

Dominguez has failed to offer evidence that she was disabled under the ADA and therefore failed to state a prima facie case of ADA discrimination and failure to accommodate as to either Defendant. Because evidence of a disability is not required to state an ADA retaliation claim and given the dispute of fact as to whether Dominguez's call offs constituted an accommodation request for medical leave, summary judgment is denied on the ADA retaliation claim against Eagle River. However, because Dominguez failed to show that she was adversely impacted by any action of Manpower, which is also a required element of an ADA retaliation claim, summary judgment is granted in favor of Manpower on all claims.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge